# UNITED STATES DISTRICT COURT

# DISTRICT OF NEVADA

* * *

UNITED STATES OF AMERICA,

    Plaintiff,

v.

JAMES EVANS,

    Defendant.

3:13-CR-00079-LRH-WGC

ORDER

    This case involves a traffic stop that led to the arrest of Defendants James Evans ("Evans") and September McConnell ("McConnell"), and subsequent charges for conspiracy to distribute five grams or more of methamphetamine, possession with intent to distribute, and carrying a firearm in relation to a drug trafficking crime. Following an evidentiary hearing on December 20, 2013, the Court granted Evans' Motion to Suppress, finding that the traffic stop was unreasonably prolonged for purposes of the Fourth Amendment. The United States appealed, and on May 20, 2015, the Ninth Circuit Court of Appeals found that the traffic stop was unreasonably prolonged, and remanded for a determination of whether independent reasonable suspicion existed to justify prolonging the stop to conduct the ex-felon registration check and dog sniff.

    The parties submitted memoranda presenting their arguments regarding independent reasonable suspicion on July 6, 2015 (Doc. #106[1]; Doc. #107), and replies on July 13, 2015 (Doc.

---

[1] Refers to the Court's docket number.

#108; Doc. #109). The Court has considered the Ninth Circuit's opinion, and all evidence and briefing before the Court, and finds that no independent reasonable suspicion existed to justify prolonging the traffic stop beyond the constitutional limits of the Fourth Amendment as described in *Rodriguez v. United States*, 135 S. Ct. 1609, 1615 (2015).

I.     **Facts and Procedural History**

Throughout 2012 and 2013, the Drug Enforcement Administration ("DEA") task force in Reno, Nevada, collected evidence from jailhouse sources that Evans was distributing methamphetamine in the Reno and Sparks area. This information led Detective Blaine Beard ("Beard") of the Washoe County Sheriff's Department to obtain authorization from a state court judge to track the location of a cell phone that Beard believed Evans used for drug activities. On July 22, 2013, cell phone data indicated to Beard that Evans was leaving Nevada traveling westbound. Later that night, cell phone data indicated that Evans had stopped at a Super 8 Motel in Sacramento, California. Early the next morning, Beard contacted Washoe County Sheriff's Deputy Brandon Zirkle ("Zirkle"), who he had known for "years," and informed Zirkle that he believed Evans was traveling from California with narcotics along Interstate 80 ("I-80"). Zirkle is canine-certified and had his drug detection dog "Thor" with him that day. Beard requested that Zirkle position his vehicle along I-80 and pull Evans over once his vehicle passed Zirkle's location. Beard specifically requested that Zirkle "develop [his] own probable cause," in order to keep the traffic stop separate from the DEA's ongoing investigation.[2] Based on this information, Zirkle parked his vehicle on the Nevada side of the California-Nevada border on I-80 and waited for Evans. At approximately 6:37 pm, DEA officers observed Evans' vehicle traveling eastbound on I-80 approximately forty-five minutes west of Reno. Beard informed Zirkle, who had been waiting near I-80 for Evans' vehicle for approximately eleven hours.

---

[2] Zirkle testified that this procedure, called a "wall stop," is meant to "try and separate an investigation and make it a completely separate investigation based on my own probable cause for the stop and my investigation roadside, where we would not have to disclose any information that [Beard] had from his prior investigation." Doc. #75 at 10:18-25.

2

Soon after this alert, Zirkle identified the vehicle that had been described to him with the reported license plate number. Zirkle testified that he observed Evans change lanes in a manner that caused the vehicle behind to apply the brakes, in violation of two Nevada traffic laws that prohibit unsafe lane changes and following a vehicle too closely. *See* NRS §§ 484B.223(1)(b), 484B.127(1). Zirkle effectuated a traffic stop at approximately 7:09 pm. Zirkle approached the passenger side of Evans' vehicle and requested his license and registration. Zirkle testified that as he approached, he smelled a "very strong odor of methamphetamine" from inside the vehicle. Zirkle asked Evans to exit the car, told him that he was pulled over for making an unsafe lane change, and asked Evans where he was coming from. Evans answered that he was driving from Grass Valley, California to Reno, Nevada. Zirkle patted Evans down for weapons and asked him to wait by the patrol car while he "checked some numbers." After conducting a check of the vehicle identification number associated with Evans' car, Zirkle asked Evans' passenger McConnell for her identification. Zirkle testified that he believed that McConnell was pretending to sleep, and that he detected signs of extreme nervousness, including shaking hands and a visible pulse in her neck. McConnell stated that she and Evans were traveling from California, where they had stayed with one of Evans' friends.

At 7:13 pm, four minutes into the stop, Zirkle told Evans that he was not going to write a ticket, but that he needed to run a check for outstanding warrants before Evans could leave. While Zirkle was conducting the records check, Evans informed him that he had been arrested before and that he had past trouble with his license related to failure to pay child support. Around this time, Nevada State Trooper Jason Phillips ("Phillips") arrived at the scene. At 7:20 pm, approximately eleven minutes after the stop began, the operator reported that the records check for the car and Evans and McConnell's driver's licenses came back clean.

Zirkle then requested an ex-felon registration check, which entailed checking Evans' criminal history and determining whether he was properly registered as a felon at the address provided. While waiting for the results of the ex-felon registration check, Zirkle asked Evans why

3

McConnell told him that they had stayed at a hotel, aware that this statement was false, in order to see if Evans' story would stay consistent. Evans responded that they had stayed at a motel in Sacramento before visiting a friend's house in Grass Valley. At this point, Zirkle told Evans that he would be free to leave once he received the results of the ex-felon registration check. Speaking out of Evans' earshot, Phillips told Zirkle that he smelled a strong odor of marijuana coming from the car, but did not mention smelling methamphetamine.

At 7:28 pm, approximately nineteen minutes after the stop began, dispatch informed Zirkle that Evans had been convicted two times for drug-related charges and that he was properly registered. Zirkle gave Evans a warning, returned his license and paperwork, and told him "you're good to go." As Evans walked away, Zirkle asked Evans if he could ask a few more questions. Evans turned back to Zirkle, and Zirkle asked if he had any drugs in the car, mentioning marijuana, methamphetamine, cocaine, and heroin. Evans denied having any drugs in the car. Next, Zirkle asked for consent to search the car, which Evans refused.

Based on everything that he observed during the stop, Zirkle believed at this point that he had reasonable suspicion to conduct a canine sniff around Evans' vehicle. The officers instructed Evans and McConnell to sit on a rock away from the vehicles as Zirkle conducted the dog sniff. The canine "Thor" alerted to the odor of a controlled substance near the passenger door at approximately 7:33 pm, twenty-four minutes after the traffic stop began. A subsequent search revealed a double-bagged plastic bag containing methamphetamine and small bags of marijuana and crack cocaine located inside a hard sunglass case in the console between the driver and passenger seats of Evans' vehicle. Evans and McConnell were arrested and charged with conspiracy to distribute five grams or more of methamphetamine, possession with intent to distribute, and carrying a firearm in relation to a drug trafficking crime. Evans was also charged for being a felon in possession of a firearm.

On October 21, 2013, Evans filed a Motion to Suppress, arguing that the evidence obtained in the search that followed the positive canine alert was tainted based on a traffic stop that was

4

unreasonably prolonged. Doc. #41. At an evidentiary hearing on December 20, 2013, the Court heard testimony of Zirkle and Beard. After considering the evidence and arguments presented by both parties, the Court granted Evans' Motion to Suppress, finding that this was "a classic subterfuge traffic stop" and that the stop was unduly prolonged. Doc. #75.

The United States filed a Notice of Appeal on January 17, 2014. Doc. #63. On October 6, 2014, the Ninth Circuit Court of Appeals vacated submission of the case pending the United States Supreme Court's disposition of *Rodriguez v. United States*. Doc. #86. The Supreme Court decided *Rodriguez* on April 21, 2015. 135 S. Ct. 1609 (2015). Applying *Rodriguez*, the Ninth Circuit held on May 20, 2015, that Evans' traffic stop was unreasonably prolonged, and that the dog sniff was "'aimed at detect[ing] evidence of ordinary criminal wrongdoing,' rather than an 'ordinary inquir[y] incident to [the traffic] stop.'" *United States v. Evans*, 786 F.3d 779, 786 (9th Cir. 2015) (internal citations omitted). The Court added that this was an unconstitutional seizure "unless there was independent reasonable suspicion justifying each prolongation," referring to the ex-felon registration check and the dog sniff. *Id.* (citing *Rodriguez*, 135 S. Ct. at 1612). As such, the court remanded "for consideration in the first instance of whether Zirkle's prolongation of the traffic stop was supported by independent suspicion." *Id.* at 789.

The Ninth Circuit's mandate was entered on June 12, 2015. Doc. #100. Thereafter, Evans and the United States submitted memoranda regarding whether independent reasonable suspicion existed to justify each prolongation of the traffic stop (Doc. #106; Doc. #107), and timely replies (Doc. #108; Doc. #109).

**II.     Legal Standard**

It is well-settled that a traffic stop is a seizure within the meaning of the Fourth Amendment. *See Delaware v. Prouse*, 440 U.S. 648, 653 (1979); *Whren v. United States*, 517 U.S. 806, 809-10 (1996). In the context of an investigatory traffic stop, an officer need only have reasonable suspicion to justify the seizure. *See United States v. Lopez-Soto*, 205 F.3d 1101, 1104-05 (9th Cir. 2000) (concluding that *Whren* did not alter the well settled law that reasonable

suspicion is enough to support an investigatory traffic stop under the Fourth Amendment); *Brendlin v. California*, 551 U.S. 249, 263 (2007) (concluding that a seizure began at the moment the car came to a halt on the side of the road). Reasonable suspicion requires "specific, articulable facts which, together with objective and reasonable inferences, form the basis for suspecting that the particular person detained is engaged in [a traffic violation]." *United States v. Michael R.*, 90 F.3d 340, 346 (9th Cir. 1996) (quoting *United States v. Garcia-Camacho*, 53 F.3d 244, 246 (9th Cir. 1995)). Reasonable suspicion "can rest on a mistaken understanding of the scope of a legal prohibition." *Heien v. North Carolina*, 135 S. Ct. 530, 536 (2014)

While an officer "may conduct certain unrelated checks during an otherwise lawful traffic stop. . . . he may not do so in a way that prolongs the stop, absent the reasonable suspicion ordinarily demanded to justify detaining an individual." *Rodriguez v. United States*, 135 S. Ct. 1609, 1615 (2015). An officer's prolongation of a traffic stop to conduct a dog sniff "violate[s] the Fourth Amendment unless the officer had independent reasonable suspicion to support the prolongations." *Evans*, 786 F.3d at 780-81. "Like a *Terry* stop, the tolerable duration of police inquiries in the traffic-stop context is determined by the seizure's 'mission'—to address the traffic violation that warranted the stop, and attend to related safety concerns." *Rodriguez*, 135 S. Ct. at 1614. "In assessing whether a detention is too long in duration to be justified as an investigative stop," it is proper "to examine whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly." *United States v. Sharpe*, 470 U.S. 675, 686 (1985). Ultimately, the analysis remains one of reasonableness, and thus the court must examine the "totality of the circumstances" surrounding the stop to determine whether the length is reasonable. *See United States v. Turvin*, 517 F.3d 1097, 1101 (9th Cir. 2008).

**III. Discussion**

The Ninth Circuit agreed with the Court that the traffic stop was prolonged "beyond the time reasonably required to complete" the mission of the traffic stop. *Evans*, 786 F.3d at 786 (quoting *Illinois v. Caballes*, 543 U.S. 405, 407 (2005)). Thus, the limited question now before the

Court is whether "there was independent reasonable suspicion justifying each prolongation." *Id.*

The United States argues that Zirkle's scent of the odor of methamphetamine establishes independent reasonable suspicion to justify prolonging the stop to conduct the ex-felon registration check and the dog sniff. Alternatively, the United States identifies a number of factors that contributed to Zirkle's reasonable suspicion, including McConnell's nervousness, Evans' slight change to response about where they were traveling from when asked a second time by Zirkle, and the investigators' awareness, under the collective knowledge doctrine, that Evans had moved from his registered residence in Reno.

### A. Scent of Methamphetamine or Marijuana

Zirkle testified that he smelled methamphetamine coming from the vehicle when he first approached the passenger door. It is well-established that an officer's scent of illegal drugs upon approaching a vehicle is sufficient to establish reasonable suspicion, or even probable cause. *See, e.g.*, *United States v. Barron*, 472 F.2d 1215, 1216 (9th Cir. 1973) (finding that an officer's scent of marijuana "alone was sufficient to constitute probable cause for a subsequent search for marijuana"); *United States v. Beck*, No. 2:12-cr-0362, 2015 WL 74125, at *13 (D. Nev. Jan. 6, 2015) ("The odor of marijuana emanating from a vehicle establishes sufficient probable cause to search the vehicle.").

The Ninth Circuit advised that "[w]hether Zirkle possessed independent reasonable suspicion to prolong the detention depends in part on whether the district court finds the officers' testimony concerning the relevant facts credible, and in part on whether the information the officers had provided reasonable suspicion justifying the dual delay." *Evans*, 786 F.3d at 788-89; *see also United States v. Sanders*, No. 2:14-cr-0369, 2015 WL 1413386, at *8 (D. Nev. Mar. 27, 2015) (finding that the officers' testimony that they detected the odor of marijuana as they approached the vehicle did not support reasonable suspicion to conduct the stop because the officers' testimony prior to that point was not credible). As the Court observed at the December 20, 2013 evidentiary hearing, there is reason to doubt the officers' testimony regarding the odor of contraband emanating

from the car. First, Zirkle testified that he smelled methamphetamine, whereas Phillips testified that he smelled marijuana. Second, Zirkle stated that he smelled a "very strong odor" of methamphetamine. Doc. #75 at 20:19-21. However, cross-examination revealed that the methamphetamine was "double-bagged" inside two ziplock bags. *Id.* at 112:12-17. Additionally, the methamphetamine was in its crystallized form, rather than liquid form. Beard testified that methamphetamine smells strongest in its liquid form, but that when it is dry, methamphetamine "has a faint smell." *Id.* at 164:2-165:7. Finally, Zirkle testified that he could not state with certainty that this was the product he was smelling. *Id.* at 114:6-8. The United States now asserts that the odor of methamphetamine likely came from the pipe with residue found in the passenger area of the vehicle, but the officers did not testify at the December 20, 2013, evidentiary hearing that this residue was tested and revealed to be methamphetamine.

### B. Other Factors Supporting Reasonable Suspicion

The United States argues that three other factors contributed to independent reasonable suspicion to prolong the stop. First, Zirkle testified that McConnell showed signs of nervousness. Specifically, Zirkle thought that McConnell was pretending to sleep to avoid questioning, and that he noticed a visible pulse in her neck. Personality factors "such as nervousness are part of a reasonable suspicion analysis but, standing alone, carry little weight because many citizens become nervous during a traffic stop, even when they have nothing to hide." *State v. Beckman*, 305 P.3d 912, 918 (Nev. 2013) (citing *United States v. Arvizu*, 534 U.S. 266, 275 (2002)); *see also United States v. Chavez-Valenzuela*, 268 F.3d 719, 726 (9th Cir. 2001), *overruled on other grounds* by *Muehler v. Mena*, 544 U.S. 93 (2005) (holding that nervousness alone does not establish reasonable suspicion or justify a prolonged detention). Accordingly, even if McConnell exhibited signs of nervousness, this was not sufficient to establish independent reasonable suspicion to justify prolonging the detention.

Second, the United States argues that Evans' willingness to change his story about their trip constituted independent reasonable suspicion. In particular, Evans first told Zirkle that he and

McConnell had stayed with a friend in Grass Valley, California. When Zirkle represented that McConnell told him they had stayed in a motel—although McConnell did not, in fact, say this—Evans stated that they had stayed in a motel in Sacramento before driving to Grass Valley, where they stayed with a friend. Doc. #75 at 26:17-23. These stories are not necessarily contradictory, and certainly are not so different that the change constitutes independent reasonable suspicion of criminal activity to prolong the stop. *See United States v. Simpson*, 609 F.3d 1140, 1150 (10th Cir. 2010) (finding that "fairly minor evasions and consistencies" normally do not constitute reasonable suspicion); *United States v. Estrada*, 459 F.3d 627, 631 (5th Cir. 2006) ("Mere 'uneasy feelings' and inconsistent stories between a driver and passenger do not constitute articulable facts that support a reasonable suspicion of drug trafficking.").

Third, the United States argues that it had independent reasonable suspicion to prolong the stop because an informant told the DEA that Evans had moved from his residence, where he was registered as an ex-felon, to a different residence. Doc. #107 at 12-13. This argument relies on the collective knowledge doctrine, under which courts "look to the collective knowledge of all the officers involved in the criminal investigation although all of the information known to the law enforcement officers involved in the investigation is not communicated to the officer who actually makes the stop." *United States v. Sutton*, 794 F.2d 1415, 1426 (9th Cir. 1986). The Court has already found that the collective knowledge doctrine does not apply here. Doc. #75 at 205:4-206:9 ("Bottom line, the government hasn't shown probable cause through the collective knowledge doctrine. . . . We just don't have the joint action of law enforcement attempting to operate in the same function and purpose as classically arises in collective knowledge cases."). There is no evidence in the record that the officers knew about this address change when they decided to prolong the traffic stop to conduct the ex-felon registration check and the dog sniff. Accordingly, the address change does not constitute independent reasonable suspicion to prolong the stop.

///

///

**C. Independent Reasonable Suspicion Analysis**

Even taking the officers' testimony as true despite the credibility questions described above, the Court finds that the officers' prolongations of the traffic stop were not supported by independent reasonable suspicion. Zirkle testified that he smelled methamphetamine coming from the vehicle upon his initial approach. Although the United States now contends that Zirkle had probable cause for a search the moment he smelled methamphetamine, the officers prolonged the stop for more than twenty additional minutes, first by conducting records checks on Evans, McConnell, and the vehicle.[3] After these checks came back clean, approximately eleven minutes into the stop, Zirkle requested an ex-felon registration check without explanation. This check came back clean eight minutes later, a total of nineteen minutes after the stop began. Still without additional reasonable suspicion, Zirkle requested consent for a dog sniff, and then conducted a dog sniff without consent, adding another five minutes to the stop before "Thor" positively alerted to the scent of contraband. The seizure lasted a total of twenty-four minutes prior to Thor's positive alert. For much of this seizure, both Evans and his passenger McConnell were detained near a rock on the side of the road away from their vehicles.

The Court recognizes that a number of innocent factors, when added together, can amount to independent reasonable suspicion. *See United States v. Sokolow*, 490 U.S. 1, 9 (1989) ("Any one of these factors is not by itself proof of any illegal conduct and is quite consistent with innocent travel. But we think taken together they amount to reasonable suspicion."). However, in this case the Court finds that the factors identified by the United States did not constitute independent reasonable suspicion to continue prolonging the stop after each records check came back clean. Importantly, the United States has not provided any explanation for the officers' decision to prolong the stop despite allegedly having reasonable suspicion following Zirkle's initial contact with the vehicle. The United States seems to argue that once an officer has probable cause to

---

[3] It is well established that a records check is an expected part of a traffic stop. *See United States v. Mendez*, 476 F.3d 1077, 1080 (9th Cir. 2007); *Berkemer v. McCarty*, 468 U.S. 420, 437 (1984).

conduct a search—here based on the scent of methamphetamine—the officer has carte blanche to prolong the detention as long as he or she wants, regardless of whether additional reasonable suspicion arises to justify such prolongations. This argument is directly contrary to *Rodriguez*'s focus on expeditious investigations in traffic stops. *See Rodriguez*, 135 S. Ct. at 1616 (rejecting the argument that "by completing all traffic-related tasks expeditiously, an officer can earn bonus time to pursue and unrelated criminal investigation"); *see also Caballes*, 543 U.S. at 407 ("[A] seizure that is lawful at its inception can violate the Fourth Amendment if its manner of execution unreasonably infringes interests protected by the Constitution."). In sum, it is clear that after Zirkle purportedly had reasonable suspicion for a dog sniff based on the scent of methamphetamine, the officers did not "diligently pursue[] a means of investigation that was likely to confirm or dispel their suspicions quickly." *Sharpe*, 470 U.S. at 686.

The question now before the Court is whether "there was independent reasonable suspicion justifying *each* prolongation." *Evans*, 786 F.3d at 786 (emphasis added). The Ninth Circuit's focus on *each* prolongation indicates that even if independent reasonable suspicion existed to justify the ex-felon registration check based on McConnell's nervousness and the smell of methamphetamine, the United States would need to identify *additional* independent reasonable suspicion to justify the second prolongation—the dog sniff. Below, the Court addresses each prolongation in turn.

### 1. The Ex-Felon Registration Check

The United States argues that independent reasonable suspicion existed to conduct an ex-felon registration check, which entailed determining whether Evans was properly registered as a felon at the address provided, because Zirkle smelled methamphetamine as he approached the vehicle, and McConnell exhibited signs of extreme nervousness. As discussed above, a passenger's nervousness carries little weight because it is common for citizens to feel nervous when stopped by the side of the road by a police officer at night. *Beckman*, 305 P.3d at 918 (citing *Arvizu*, 534 U.S. at 275). Thus, Zirkle's primary justification for conducting the ex-felon

11

registration check was his purported scent of methamphetamine as he approached Evans' vehicle.

A traffic stop should not be prolonged beyond the time reasonably required to complete the "mission" of the stop and attend to safety-related concerns. *Rodriguez*, 135 S. Ct. at 14 (citing *Caballes*, 543 U.S. at 407). "Typically such inquiries involve checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance." *Id.* at 1615. This mission also includes "ordinary inquiries incident to such a stop." *Id.* (quoting *Caballes*, 543 U.S. at 408). However, officers are not empowered to prolong a stop to collect "evidence of ordinary criminal wrongdoing."[4] *Id.* (quoting *Indianapolis v. Edmond*, 531 U.S. 32, 40-41 (2000)).

The fact that Zirkle allegedly smelled methamphetamine when he first approached Evans' vehicle might have justified reasonable questions unrelated to the purpose of the original stop but designed to discover more information about Evans and whether he was likely transporting drugs. However, despite smelling methamphetamine at the beginning of the stop, it took Zirkle more than eleven minutes to ask Evans for details about his origin and destination, and more than nineteen minutes to ask whether Evans had drugs in the car. Rather, at the eleven minute mark, Zirkle requested an ex-felon registration check, which is not designed to return information about drug activity but instead to determine whether Evans was registered at the correct address. Even if Zirkle's scent of methamphetamine justified conducting an investigation related to whether Evans had drugs in the car, Evans' address and registration information simply was not relevant to any such investigation. Although Zirkle may have had reasonable suspicion to ask questions or conduct certain acts outside the traffic stop's mission, he had no independent reasonable suspicion to justify

---

[4] In *Evans*, the Ninth Circuit referred favorably to two cases in which other circuit courts "observed that extending traffic stops to perform criminal history checks may be unlawful." 786 F.3d at 787 n.7; *see United States v. Boyce*, 351F.3d 1102, 1107 (11th Cir. 2003) ("[T]he criminal history check could not be part of the original traffic stop investigation and could not be the basis for prolonging Boyce's detention."); *United States v. Finke*, 85 F.3d 1275, 1280 (7th Cir. 1996) (rejecting a bright line rule that a criminal history check is permissible in all traffic stops "because often criminal history checks take longer to process than the usual license and warrant requests, and after a certain point meaningful additional time could, we believe, constitute an unreasonable detention of the average traveler").

prolonging the stop to conduct an ex-felon registration check that merely returned information about Evans' address. Thus, the ex-felon registration check was an improper attempt to collect "evidence of ordinary criminal wrongdoing" without independent reasonable suspicion. *See Rodriguez*, 135 S. Ct. at 1615; *Evans*, 786 F.3d at 788. Accordingly, the Court affirms its decision to grant Evans' Motion to Suppress because Zirkle unreasonably prolonged the stop to conduct an ex-felon registration check without independent reasonable suspicion.

### 2. The Dog Sniff

Even if Zirkle had independent reasonable suspicion to justify the ex-felon registration check, no new indicia of criminal activity arose after the registration check that justified prolonging the stop further to conduct a dog sniff. The only purported evidence that arose after Zirkle initiated the ex-felon registration check but before the dog sniff was that Evans modified his story slightly to say that he and McConnell had stayed at a motel before visiting a friend in Grass Valley. This minor change to Evans' story did not necessarily contradict the initial story—that they had stayed with a friend in Grass Valley—and certainly does not constitute reasonable suspicion of criminal activity to justify further prolongation of the traffic stop to conduct a dog sniff without consent.

The United States is correct that after conducting a traffic stop and telling the driver that he or she is free to leave, the officer is not required to forget details about the stop that might support reasonable suspicion. *See* Doc. #109 at 11-12; *see also United States v. Fuse*, 391 F.3d 924, 929 (8th Cir. 2004) ("[T]he termination of a traffic stop does not effectively erase the objectively reasonable suspicions developed by a police officer during the traffic stop."). However, the Court finds the Nevada Supreme Court's decision in *State v. Beckman* to be persuasive. There, the officer effectuated a traffic stop, verified Beckman's license and registration, told him "everything checks good," and issued a warning. 305 P.3d at 914. Immediately afterward, the officer reinitiated contact and ordered Beckman to remain until a dog arrived. *Id.* The court held that "[a] traffic stop that is legitimate when initiated becomes illegitimate when the officer detains the car and driver beyond the time required to process the traffic offense, unless the extended detention is consensual,

de minimis, or justified by a reasonable articulable suspicion of criminal activity." *Id.* at 915. After finding that this prolongation was unconstitutional because it was not consensual, de minimis, or supported by new reasonable suspicion, the court emphasized that whatever reasonable suspicion did exist was "observed *before* [the officer] decided to issue a warning and send Beckman on his way." *Id.* at 918 (emphasis in original).

As in *Beckman*, Zirkle told Evans that he was free to leave after the ex-felon registration check came back clean. Although Zirkle could rely on information obtained before the stop became unreasonably prolonged to support his finding of reasonable suspicion, *Evans* and *Beckman* require that once the stop becomes unreasonably prolonged, any purported reasonable suspicion to justify further prolongations must be supported by *new* indicia of criminal activity. The only new evidence that arose after Zirkle conducted the ex-felon registration check was Evans' slight alteration of his story; this change in Evans' story was not necessarily contradictory, nor did it constitute reasonable suspicion of criminal activity. Additionally, as discussed above, the Court finds that the other factors that contributed to Zirkle's purported reasonable suspicion are not sufficient to constitute independent reasonable suspicion. *See id.* at 919 (expressing concern "about the inclination of Government toward using whatever facts are present, no matter how innocent, as indicia of suspicious activity").

Based on the foregoing, the Court finds that no independent reasonable suspicion existed to support prolonging Evans' detention to conduct a dog sniff. Accordingly, the Court confirms its finding that the evidence discovered in the subsequent search of Evans' car should be suppressed.

**IV.     Conclusion**

IT IS THEREFORE ORDERED that the Court confirms its prior ruling GRANTING Evans' Motion to Suppress (Doc. #41).

IT IS SO ORDERED.

DATED this 7th day of August, 2015

_____
LARRY R. HICKS
UNITED STATES DISTRICT JUDGE

14